# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

IONIE SCOTT,[1] on behalf of herself and
those similarly situated,
      Plaintiffs,

      v.

GRISWOLD HOME CARE, et al.,
      Defendants.

No. 3:19-cv-527 (SRU)

## ORDER

      In substance, this case is about a home health care worker suing her employers on behalf of herself and those similarly situated to recover unpaid overtime wages and unwarranted wage deductions pursuant to both the Fair Labor Standards Act ("FLSA")[2] and analogous state-law provisions.[3]  At this stage, though, the case is entirely about whether the instant dispute should be submitted to arbitration.  The defendants have made a motion to dismiss, or, in the alternative, to stay and compel arbitration.  For the following reasons, that motion is **denied**.

## I.    Standards of Review

### A.  Motion to Compel Arbitration

      Pursuant to the Federal Arbitration Act, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition" the appropriate district court "for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  To determine whether such an order should

---

[1] Unfortunately, Scott has passed away since filing this case.  *See* Notice of Suggestion of Death, Doc. No. 48. Scott's lawyer has represented that a motion for substitution, pursuant to Fed. R. Civ. P. 25(a), is forthcoming, and I have granted an extension of time for that purpose.  *See* Order, Doc. No. 56.

[2] *See* 29 U.S.C. §§ 203, *et seq.*

[3] *See* Conn. Gen. Stat. §§ 31-58, *et seq.*

issue—in other words, "to determine arbitrability"—a district court "applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see also Deleon v. Dollar Tree Stores, Inc.*, 2017 WL 396535, at *2 (D. Conn. Jan. 30, 2017). A district court should deny a motion to compel arbitration if "there is an issue of fact as to the making of the agreement for arbitration." *Bensadoun*, 316 F.3d at 175. The party seeking to compel arbitration "must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010).

B. <u>Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted</u>

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint,

2

they must be supported by factual allegations.").  The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555 (internal quotation marks omitted).  Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely."  *Id.* at 556 (internal quotation marks omitted).

## II.   Background

### A. Factual Background

#### 1. *The Parties*

The plaintiff is Ionie Scott ("Scott"), a home health aide.  She seeks to represent a class of similarly situated individuals.  Scott filed her complaint against four defendants:  (1) Griswold Home Care, (2) FMCH, Inc. ("FMCH"), (3) Maria P. Malafronte, in her individual capacity, and (4) Cathy Howard, in her individual capacity.  *See* Compl., Doc. No. 1.

Scott dismissed her claims against Malafronte on October 24, 2019.  *See* Notice, Doc. No. 37.  Regarding Griswold Home Care, Scott plainly intended to sue the franchisor Griswold Home Care, which operates through over one hundred franchisees throughout the United States (of which FMCH is one).  *See* Compl., Doc. No. 1, at ¶¶ 12–27.[4]  Scott attempted to serve Griswold Home Care, but she served the wrong party.  Instead of serving Griswold Home

---

[4] Scott explains that Griswold Home Care is a home care franchise organization that "operates through" over 150 franchisees.  Compl., Doc. No. 1, at ¶ 12.  In that capacity, Scott sought to sue Griswold Home Care as "an employer and/or joint employer of" Scott's who "exercised control over" Scott and similarly situated employees and "promulgated the standards" by which they "could be hired and retained."  *Id.* at ¶¶ 13–14, 16.  Griswold Home Care "recruited employees" through its website to "perform home health services through its franchises."  *Id.* at ¶ 15.  Griswold Home Care promoted franchise opportunities and trained franchisees and thus "actually supervise[d]" Scott and similarly situated employees.  *Id.* at ¶¶ 17, 19.  The fees generated by Scott's work were "integral" to Griswold Home Care's business.  *Id.* at ¶ 20.

Care—the large franchisor—Scott served Berks Care, Inc., a franchisee in Pennsylvania doing business as Griswold Home Care ("Berks").  *See* Aff. of Service, Doc. No. 14; Berks's Mot. to Dismiss, Doc. No. 38.  Realizing her error, Scott voluntarily dismissed Berks from the case.  *See* Notice, Doc. No. 40.  The upshot is that Griswold Home Care—the franchisor—has never been served and is not currently a party to this action, even though it is a named defendant.

Only two defendants remain:  FMCH and Cathy Howard (the "Defendants").  FMCH is an entity that, at all relevant times,[5] did business in Connecticut under the fictitious name Griswold Home Care.  *See* Decl. of C. Howard, Ex. 2 to Defs.' Mem. of Law ("C. Howard's 1st Decl."), Doc. No. 15-2, at ¶ 3; Decl. of R. Wheeler, Ex. 3 to Pl.'s Opp'n ("Wheeler Decl."), Doc. No. 21-1, at ¶ 2.  Cathy Howard co-founded FMCH (Scott alleges that her initials are the "CH" in "FMCH") and maintained control over it during the period relevant to this Complaint.  *See* Compl., Doc. No. 1, at ¶¶ 29–34; C. Howard's 1st Decl., Doc. No. 15-2; Decl. of C. Howard, Ex. A to Defs.' Supp. Mot. to Dismiss, Doc. No. 49 ("C. Howard's 2d Decl."), at ¶ 3 ("FMCH, Inc. is owned by me.").

There is another party relevant to this action:  CKJH, LLC ("CKJH").  CKJH is another entity that, at all relevant times, did business in Connecticut under the fictitious name Griswold Home Care.  *See* License Lookup, Ex. 4 to Pl.'s Opp'n, Doc. No. 21-1, at 14–15; License Lookup, STATE OF CONN., https://www.elicense.ct.gov/Lookup/LicenseLookup.aspx (last visited May 26, 2020) (enter either CKJH for "Business Name" or HCA.0001165 for "License Number").[6]  Jessica Howard—who is Cathy Howard's daughter—is a partial owner and a

---

[5]  Apparently, on November 1, 2019, FMCH changed its "doing business as" name from "Griswold Home Care" to "Griswold Special Care."  *See* License Lookup, STATE OF CONN., https://www.elicense.ct.gov/Lookup/LicenseLookup.aspx (last visited May 26, 2020) (enter either FMCH for "Business Name" or HCA.0000169 for "License Number").

[6]  There is a third entity—Bluebird LLC—that does business in Connecticut under the fictitious name "Griswold Home Care," but that entity is irrelevant to this case.

principal of CKJH.  (Although Scott does not allege it, it seems likely that she is the "JH" in

"CKJH.")  *See* C. Howard's 2d Decl., Doc. No. 49, at ¶ 2; Wheeler Decl., Doc. No. 21-1, at ¶ 4;

Bus. Inquiry, Ex. 6 to Pl.'s Opp'n, Doc. No. 21-1; Bus. Inquiry, STATE OF CONN.,

https://www.concord-sots.ct.gov/CONCORD/online?sn=PublicInquiry&eid=9740 (last visited

May 26, 2020) (enter "CKJH" into "Search by Name" field).  Jessica Howard *also* works as an

employee at FMCH.  *See* Decl. of J. Howard, Ex. A to Defs.' Reply ("J. Howard Decl."), Doc.

No. 27-1, at ¶ 2.

CKJH and FMCH are similar in several ways.  Cathy Howard and Jessica Howard are

involved with both.  Both operated under the fictitious name Griswold Home Care.  Both

concern the work of home health aides.  But there are (at least) two crucially important

differences between CKJH and FMCH.  First, FMCH is a party to this action, and CKJH is not.

Second, CKJH operates as a referral service:  it refers home health aides to clients, and the

clients pay the aides.  In contrast, FMCH is not a referral service:  it pays its home health aides

directly.  *See* C. Howard's 2d Decl., Doc. No. 49, at ¶ 2 ("During some of the times relevant to

this case, Ionie Scott received referrals for homecare services from CKJH, Inc."); *id.* at ¶ 6 (" . . .

FMCH, Inc. is not a referral service . . . .").

2.  *Scott's Claims on the Merits*

Scott alleges that she began working for the Defendants around February 2017 and

continued until about October 2018.  *See* Compl., Doc. No. 1, at ¶ 4.  Scott alleges that the

Defendants employed her.  *See id.* at ¶ 40.  Scott explains that the Defendants provide home

health care services to elderly and infirm individuals in Connecticut through home health care

aides.  *See id.* at ¶ 42–43.  The Defendants determine their aides' specific work assignments and

hours of operation and then assign them to work fixed schedules based on their clients' needs.

*See id.* at ¶¶ 44–45.  Further, the Defendants require aides to obtain the Defendants' approval for schedule alterations and to lodge complaints about clients.  *See id.* at ¶¶ 46–48.  While Scott worked for the Defendants, she "was not entitled to earn any incentive, bonus, commission or profit share other than the compensation paid to her by Defendants as wages for hours worked." *Id.* at ¶ 52.

The Defendants required Scott to perform both typical home health care duties—such as bathing, grooming, and toileting—and general housekeeping duties, such as meal planning, vacuuming, doing laundry, running errands, and caring for pets.  *See id.* at ¶¶ 55–58.  The Defendants typically scheduled aides for 24-hour shifts—which included both home health care duties and general housekeeping duties—and paid Scott a wage of $158 for each 24-hour shift. *See id.* at ¶ 61.  For any work she performed outside of her normal duties, Scott would be paid an hourly rate.  *See id.* at ¶ 62.  Scott routinely worked seven days per week and often worked in excess of 13 hours per 24-hour shift.  *See id.* at ¶ 65.  Scott thus consistently worked well over 40 hours per workweek.  *See id.*  No matter how many hours she worked, though, Scott was "paid only straight time pay by way of twenty-four (24) hour shift pay and/or hourly pay."  *Id.* at ¶ 67. In other words, the Defendants did not pay overtime to any home health care aides.  *See id.* at ¶ 68.  Scott alleges that the Defendants deprived over 400 other home health care aides in that way.  *See id.* at ¶ 69.  Scott explains that she was "never provided with information, either written or verbal, regarding her eligibility for overtime pay."  *Id.* at ¶ 70.

Scott also alleges that the Defendants withheld $10 per day in wages based on the promise that the Defendants (or their clients) would provide a daily meal of that value.  *Id.* at ¶ 72.  But—even though repeatedly brought to their attention—the Defendants (or their clients)

never provided such meals.  *Id.* at ¶¶ 73–74.  Still, the Defendants continued to deduct $10 per day from her wages.  *Id.* at ¶ 75.

Scott thus seeks to represent, pursuant to the Fair Labor Standards Act, a collective action of "[a]ll home health care aides employed by Defendants on and after three years from the date this action is commenced who were not paid overtime for hours worked over forty in a workweek."  *Id.* at ¶¶ 77, 86–88; *see also* 29 U.S.C. § 216(b).  Scott also seeks to represent a class "of employees who were and are employed as home health aides by Defendants from April 7, 2011 through the present day and who were not properly paid overtime pay and/or had unlawful deductions taken from their wages pursuant to" Connecticut state law.  *See id.* at ¶¶ 79, 89–97; Conn. Gen. Stat. §§ 31-60, 31-71e.

### 3.  *The Caregiver Agreement and the Arbitration Agreement*

On May 23, 2016, Scott executed a type of employment contract (the "Caregiver Agreement").  The Caregiver Agreement contained an Arbitration Agreement as one of its subparts.  Two people signed and dated the Caregiver Agreement on its last page:  Ionie Scott signed under "Caregiver," and Jessica Howard signed under "Griswold Home Care, A Referral Service" and listed her title as "HR."  *See* Caregiver Agreement, Ex. 1 to Defs.' Mem. of Law ("Caregiver Agreement"), Doc. No. 15-2, at 6.

The Caregiver Agreement is five pages, single-spaced.  It bears the corporate logo of "Griswold Home Care" on the top left of each page.  The Caregiver Agreement begins:

> The parties to this Agreement ("Agreement") are the independently owned and operated franchise entity _____ licensed to do business as GRISWOLD HOME CARE, A Referral Service, ("GRISWOLD"), and the individual Caregiver whose signature appears below ("You") or collectively, the "Parties".  The Parties, for the consideration given and received, each intending to be legally bound, AGREE to the following terms . . . .

*Id.* at 2.  The space following "franchise entity" was left blank.  The Agreement continues:

> GRISWOLD operates a registry referral service that recruits, thoroughly screens, registers and refers Caregivers who are in the business of providing personal care, homemaking, companionship and activities of daily living services to Clients requesting such referrals . . . .  You have sought to be listed on GRISWOLD's registry of Caregivers available for referral.  This Agreement contains the terms under which Your listing on that registry will take place.

*Id.*  The Caregiver Agreement explains that GRISWOLD would merely refer Caregivers to clients and, as such, a Caregiver is "an independent contractor and not an employee."  *Id.* at 2–3 (¶ 4).  The Caregiver Agreement contemplates that "You will be paid for Services by the Client directly on a fee-for-Service basis."  *Id.* at 2 (¶ 3).  The Caregiver Agreement continues:

> If payment for your Services has resulted in billing slips being submitted to an insurance company or other third-party payer by the Client, You may receive a Form 1099, which will report to federal, state and local taxing authorities the amount of income that source paid to You during the year.  Some Individual Clients may also issue You a Form 1099 showing their payments to You.  You are responsible for keeping track of all hours You work and payments You receive from all Clients.

*Id.* at 3 (¶ 4).  The Caregiver Agreement explains that its "Term . . . shall be for the period of time You provide Services to Clients referred to You by GRISWOLD."  *Id.* at 3 (¶ 7).  The Caregiver Agreement also contains an arbitration clause, referred to as the "Arbitration Agreement."  The Arbitration Agreement begins:

> Any and all disputes, claims or controversies arising out of or relating to this Agreement, Your Services under this Agreement and any and all other disputes, claims or controversies by and between You, on the one hand, and GRISWOLD, its franchisor, and their respective Clients, customers, and vendors (collectively, the "GRISWOLD PARTIES"), on the other hand, shall be resolved exclusively through final and binding arbitration (and not by way of a court or jury trial) . . . .

*Id.* at 3 (¶ 8).  The Arbitration Agreement provides that it

> shall be governed, construed and enforced pursuant to the Federal Arbitration Act. However, any claims submitted to arbitration regarding other terms of this Agreement shall be governed by the law of the State where Services are or were provided by You.

*Id.* at 3 (¶ 8a).  With respect to arbitration itself, the Arbitration Agreement explains that "all claims shall be decided by a single neutral arbitrator who shall be a retired judge or justice."  *Id.* at 4 (¶ 8d).  But if the parties cannot agree on that neutral arbitrator after 45 days, a party may apply to a court, which would appoint an arbitrator.  *Id.*  In arbitration, "each party will have the right to conduct adequate civil discovery to extent [*sic*] permitted under the Federal Rules of Civil Procedure, bring dispositive motions, and present witnesses and evidence as needed."  *Id.* at 4 (¶ 8e).  The Arbitration Agreement also contains a class action waiver that reads:

> In arbitration, there shall be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective or representative action or as a class member in any purported class, collective action or representative proceeding.

*Id.* at 4 (¶ 8f).  The Arbitration Agreement also addresses the cost of a potential arbitration:

> In arbitration, each party will pay the fees for his, her or its own attorneys, subject to applicable law and/or any remedies to which that party may later be entitled under applicable law.  However, in all cases where required by applicable law, the GRISWOLD PARTIES will pay the arbitrator's and arbitration fees.  If, however, under applicable law, the GRISWOLD PARTIES are not required to pay all of the arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the Parties in accordance with said applicable law, and any disputes in that regard will be resolved by the arbitrator.

*Id.* at 4 (¶ 8h).  The Arbitration Agreement also contains an opt-out clause:

> You may submit a document or email stating that [] You wish to opt out and not be bound by this Arbitration Agreement . . . .  To Opt Out, [] You must submit a tangible or electronic document containing Your name and current address and stating words to the effect that "Caregiver wishes to Opt Out of the arbitration agreement" . . . .  To be effective, the Opt Out statement must be sent to the GRISWOLD PARTIES (at the following address: _____ or email address _____, Attention: _____) within 30 days after You have signed this Agreement . . . .  You have the right to consult with counsel of Your choice concerning this Agreement including this arbitration agreement.

*Id.* at 5 (¶ 8j).  The spaces for contact information were left blank.  The Arbitration Agreement concludes:

BY SIGNING THIS AGREEMENT, BOTH GRISWOLD PARTIES AND YOU WAIVE ANY RIGHTS TO HAVE SUCH DISPUTES TRIED BY A JUDGE OR JURY, OR TO APPEAL ANY FINDINGS OF THE ARBITRATOR EXCEPT AS MAY BE VACATED UNDER THE FEDERAL ARBITRATION ACT.

*Id.* at 5 (¶ 8k).  The entire Caregiver Agreement concludes:

Each Party to this Agreement acknowledges and represents that 1) s/he or it (a) has fully and carefully read this Agreement prior to signing it; (b) has been, or has had the opportunity to be, advised by independent legal counsel of his/her or its own choice as to the legal effect and meaning of each of the terms and conditions of this Agreement; (c) is entering into this Agreement as a free and voluntary act without duress or undue pressure or influence of any kind or nature whatsoever; and (d) has not relied on any promises, representations or warranties regarding the subject matter hereof other than as set forth in this Agreement.

*Id.* at 6 (¶ 11).

4.   *CKJH—not FMCH—was the "GRISWOLD" in the Caregiver Agreement.*

Scott steadfastly maintains that the Caregiver Agreement has nothing to do with this case.[7]  Scott argues that the party contracting as "GRISWOLD" was CKJH, a non-party in this case, rather than FMCH.  First, the field in the Caregiver Agreement defining "GRISWOLD" was left blank.  Scott points out that it was *Jessica* Howard with whom she met on May 23, 2016 and who signed the Caregiver Agreement.  *See* Decl. of I. Scott, Ex. 1 to Pl.'s Opp'n ("Scott Decl."), Doc. No. 21-1, at ¶ 2.  Jessica Howard was both an FMCH employee and a principal of CKJH.  Scott remarks that on May 23 Jessica Howard "never stated that Cathy Howard" or FMCH "was a party to the Caregiver Agreement" and that, in fact, Jessica Howard did not explain anything about the Caregiver Agreement."  *Id.* at ¶ 3.

Second, by its terms, the Caregiver Agreement governs a relationship between Scott and an entity—"GRISWOLD"—that "operates a registry referral service"; the Caregiver Agreement contained the terms governing Scott's listing on GRISWOLD's registry.  *See* Caregiver

---

[7]  Scott also argues that the Caregiver Agreement is invalid, but I need not reach that argument, as discussed below.

Agreement, Doc. No. 15-2, at 2.  Scott argues that her claims in this case do not concern referrals; instead, the dispute here concerns the period from February 2017 to October 2018 during which the Defendants "employed and paid Plaintiff directly."  Pl.'s Opp'n, Doc. No. 21, at 4.  More specifically, Scott explains that since February 2017, she has not received referrals of the type contemplated by the Caregiver Agreement; has not performed services under the Caregiver Agreement; and has been paid directly by the Defendants, rather than by clients.  *See* Scott Decl., Doc. No. 21-1, at ¶ 6.  Indeed, Scott provides evidence that she was paid through direct deposits from RiRiPays, LLC, which was FMCH's third-party payment processor.  *See id.*; Decl. of M. Malafronte, Ex. 8 to Pl.'s Opp'n, Doc. No. 21-1, at ¶¶ 4, 6; Wage Report, Ex. 2 to Pl.'s Opp'n, Doc. No. 21-1, at 6–8.

At first, the Defendants seemed to insist that FMCH was "GRISWOLD" in the Caregiver Agreement.  Indeed, in their initial submissions in this matter, the Defendants put forth the theory that the Caregiver Agreement was a contract between FMCH and Scott;[8] that Jessica Howard signed the Agreement as an agent of FMCH;[9] and that Scott subsequently worked for FMCH as an independent contractor.[10]  The Defendants concluded:  "There is no record evidence that Plaintiff was confused in any way as to who she contracted with."  Defs.' Reply, Doc. No. 27, at 2.  Indeed, the Defendants argued that Scott's subsequent working relationship with the Defendants was further proof that Scott knew she was contracting with them.  *See id.* at

---

[8]  *See, e.g.*, Defs.' Mem. of Law, Doc. No. 15-1, at 12 ("Under these facts, it is clear that the Plaintiff entered into a valid and binding arbitration agreement with Defendants."); *id.* ("These claims fall squarely within the scope of the Arbitration Agreement because they relate to Plaintiff's contract with Defendants."); *id.* at 4 ("When Defendants contracted with Plaintiff . . . .").

[9]  J. Howard Decl., Doc. No. 27-1, at ¶ 2 ("I am an employee of Cathy Howard and of FMCH, Inc."); *id.* at ¶ 4 ("Ionie Scott signed the 'Caregiver Agreement' form . . . in my presence and I countersigned the agreement as part of my usual business duties.").

[10]  *See* Defs.' Mem. of Law, Doc. No. 15-1, at 4 ("The Plaintiff performed homecare services as an independent contractor for the Defendant's clients."); *id.* at 6 ("Plaintiff . . . performed services for Defendants as an independent contractor during the period of approximately January 2017 to October 2018.").

6 (pointing to Scott's complaint and noting that "Plaintiff alleges and concedes she . . . acted on Defendants' behalf, yet now seeks to claim that the parties with which she contracted are uncertain").

But now the Defendants have done an about-face:  They agree that CKJH was "GRISWOLD" in the Caregiver Agreement and that the Caregiver Agreement was a contract between Scott and CKJH.  After I held a hearing in this matter regarding the instant motion, I asked the Defendants to submit a supplemental affidavit clarifying the "GRISWOLD" party to the Caregiver Agreement.  The Defendants submitted such an affidavit from Cathy Howard, which explained that CKJH was "GRISWOLD" in the Caregiver Agreement and that the only reason CKJH was not "filled in" was due to "a clerical error."  C. Howard's 2d Decl., Doc. No. 49, at ¶ 5.  In addition, whereas the Defendants previously explained that Scott worked for FMCH as an independent contractor,[11] now they swear that Scott never worked for them and that FMCH had no relationship with Scott whatsoever.  *See id.* at ¶ 6 ("FMCH, Inc. was not the entity that contracted with Ionie Scott.  Ms. Scott did not ever provide services through FMCH, Inc.  In fact, FMCH, Inc. is not a referral service, had no relationship with Ms. Scott, and did not employ her, use her services, or pay her.").

B.  Procedural Background

On April 9, 2019, Scott filed this collective and class action complaint against the four defendants identified above.  *See* Compl., Doc. No. 1.  Scott seeks certification of a collective action under the FLSA, *see* 29 U.S.C. § 216(b), and of a class action under Fed. R. Civ. P. 23 for violations of Connecticut state law, *see* Conn. Gen. Stat. §§ 31-58, *et seq.*  Scott seeks money

---

[11]  *See* Defs.' Mem. of Law, Doc. No. 15-1, at 6 ("Plaintiff . . . performed services for Defendants as an independent contractor during the period of approximately January 2017 to October 2018.").

damages and all other appropriate relief. *See* Compl., Doc. No. 1, at ¶ 98. Scott alleges three

counts: (1) failure to pay overtime in violation of the FLSA and (2) Connecticut state law, and

(3) unlawful deduction of wages under Connecticut state law. *See id.* at ¶¶ 86–97.

On June 4, 2019, the Defendants made the instant motion to dismiss, or, in the

alternative, to stay and compel arbitration. *See* Mot. to Dismiss, Doc. No. 15. The Defendants

seek dismissal based upon the Federal Arbitration Act ("FAA") and Fed. R. Civ. P. 12(b)(1) and

12(b)(6). In the alternative, the Defendants ask the Court to "strike Plaintiff's class and

collective action allegations (pursuant to FRCP 12(f)), compel Plaintiff to arbitrate her claims on

an individual basis only (9 U.S.C. § 4), and stay this case pending arbitration (9 U.S.C. § 3),

pursuant to her contractual agreement to do so." Mot. to Dismiss, Doc. No. 15, at 1.

On July 9, 2019, Scott filed a memorandum in opposition to the Defendants' motion to

dismiss. *See* Pl.'s Opp'n, Doc. No. 21. On July 23, the Defendants replied to Scott's

memorandum in opposition. *See* Defs.' Reply, Doc. No. 27. On July 30, the parties filed a Rule

26(f) report. *See* Rule 26(f) Report, Doc. No. 29. On October 24, Scott gave notice that she had

voluntarily dismissed her complaint as against defendant Malafronte. *See* Notice, Doc. No. 37.

Later, on November 20, 2019, Scott gave notice that she had also voluntarily dismissed her

complaint as against Berks, which was erroneously served in this matter, as described above.

*See* Notice, Doc. No. 40.

On November 13, 2019, I held a hearing on the instant motion and took it under

advisement. *See* Min. Entry, Doc. No. 39. At that hearing, I ordered the Defendants to submit a

supplemental affidavit to clarify, if possible, what entity had contracted as "GRISWOLD" in the

Caregiver Agreement. *See* Hr'g Tr., Doc. No. 45, at 19:24–20:1. On January 29, 2020, I held a

telephonic status conference in this matter. *See* Min. Entry, Doc. No. 47. On February 14, the

Defendants filed a supplemental motion to dismiss, which included a supplemental affidavit clarifying the parties to the Caregiver Agreement.  *See* Defs.' Supp. Mot. to Dismiss, Doc. No. 49.  On March 13, 2020, Scott responded.  *See* Pl.'s Reply to Supp. Mot. to Dismiss, Doc. No. 54.

## III.   Discussion

In its motion to dismiss, the Defendants do not address Scott's claims on the merits and argue only that her claims are "subject to a valid and enforceable arbitration agreement with Defendants."  Defs.' Mem. of Law, Doc. No. 15-1, at 3; 10–17.  After it was clarified that CKJH was the contracting party in the Caregiver Agreement, the Defendants still argue that they can compel arbitration under the Arbitration Agreement both as a matter of equitable estoppel and by the plain text of the Arbitration Agreement.  *See* Defs.' Supp. Mot. to Dismiss, Doc. No. 49.  In response, Scott argues that the Defendants cannot enforce the Arbitration Agreement against her because the Agreement is not between Scott and the Defendants.  *See* Pl.'s Opp'n, Doc. No. 21, at 4–5.  Further, Scott explains that the Defendants cannot enforce the Arbitration Agreement against her as a matter of equitable estoppel or by the Agreement's plain text.  *See* Pl.'s Reply to Supp. Mot. to Dismiss, Doc. No. 54, at 4–9.  Scott makes several other arguments in the alternative regarding both the Arbitration Agreement's invalidity and, even if it were valid, why this case does not fall within its scope.[12]  I need not consider any of Scott's alternative arguments

---

[12] For instance, Scott argues that the Arbitration Agreement is either invalid or inapplicable for all the following reasons.  (1) There is a blank space where the Arbitration Agreement should contain contact information for opting out.  *See* Caregiver Agreement, Doc. No. 15-2, at 5 (¶ 8j); Pl.'s Opp'n, Doc. No. 21, at 15–17.  (2) The Caregiver Agreement expired.  *See* Pl.'s Opp'n, Doc. No. 21, at 17–18.  (3) Scott's claims are outside the scope of the Arbitration Agreement, even if applicable.  *See id.* at 20–22.  (4) The Arbitration Agreement specifically exempts Scott's claims.  *See id.* at 22–24.  (5) The Arbitration Agreement is both procedurally and substantively unconscionable.  *See id.* at 24–27.

because I agree that there was no agreement to arbitrate between the Defendants and Scott and that the Defendants cannot enforce the Arbitration Agreement against Scott.

A. The FAA's test for Arbitrability

Where an arbitration provision is in a "contract evidencing a transaction involving commerce," federal rather than state law is controlling as to its validity. *See* 9 U.S.C. §§ 1–2; *Fromer v. Comcast Corp.*, 886 F. Supp. 2d 106, 109 (D. Conn. 2012). The Caregiver Agreement clearly evidences a transaction involving interstate commerce. Scott explains that the Defendants engaged in commerce, that their employees travelled among at least New York, Connecticut, and Pennsylvania, and that their businesses used interstate wires to communicate. Compl., Doc. No. 1, at ¶¶ 23–25, 36–38. Further, the Arbitration Agreement itself explains that it "shall be governed, construed and enforced pursuant to" the FAA. Caregiver Agreement, Doc. No. 15-2, at 3 (¶ 8a).

The FAA "creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Deleon*, 2017 WL 396535, at *2 (internal quotation marks omitted) (citing *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011)). Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon grounds as exist in law or in equity for the revocation of any contract." 9 U.S.C. § 2. There is a strong federal policy favoring arbitration, such that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *Doscher v. Sea Port Grp. Sec., LLC*, 832 F.3d 372, 385 (2d Cir. 2016). However, it is the court's role to determine

whether a particular action should be sent to arbitration.[13]  In that determination, a court must

conduct the following four inquiries:

> First, it must determine whether the parties agreed to arbitrate; second, it must
> determine the scope of that agreement; third, if federal statutory claims are asserted,
> it must consider whether Congress intended those claims to be nonarbitrable; and
> fourth, if the court concludes that some, but not all, of the claims in the case are
> arbitrable, it must then decide whether to stay the balance of the proceedings
> pending arbitration.

*JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (alterations omitted); *see also*

*In re Am. Express*, 672 F.3d at 128 (describing the test as only the first two inquiries identified in

*JLM Indus.*).

    B.  <u>The Defendants Cannot Compel Scott to Arbitrate Pursuant to the Arbitration Agreement.</u>

        1.  *FMCH and Scott did not Agree to Arbitrate.*

"[I]n evaluating whether the parties have entered in[to] a valid arbitration agreement, the

court must look to state law principles."  *Deleon*, 2017 WL 396535, at *2 (quoting *Cap Gemini*

*Ernst & Young, U.S., LLC v. Nackel*, 346 F.3d 360, 364 (2d Cir. 2003)).  The parties here agree

that Connecticut law governs the instant dispute.  *See* Defs.' Mem. of Law, Doc. No. 15-1, at 10;

Pl.'s Opp'n, Doc. No. 21, at 10.  Under Connecticut law, a meeting of the minds is necessary for

contract formation.  *Deleon*, 2017 WL 396535, at *2; *Gibbs v. Conn. Gen. Life Ins.*, 1998 WL

123010, at *2 (Conn. Super. Ct. Mar. 3, 1998).  No contract exists when "there has been a

misunderstanding between the parties, or a misapprehension by one or both so that their minds

have never met."  *Gibbs*, 1998 WL 123010, at *2 (internal quotation marks and citations

omitted).  To form a contract, "the identities of the parties must be *reasonably* certain."  *Saint*

---

[13]  The Defendants point out that arbitration clauses are severable from the contracts that contain them.  *See* Defs.'
Reply, Doc. No. 27, at 4–5 (citing, *inter alia*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46
(2006)).  That is true, but it is not material in this case:  When a party claims that it did not enter into an arbitration
clause, it is the role of the court to determine "whether the parties agreed to arbitrate."  *See, e.g.*, *Abdullayeva v.
Attending Homecare Services LLC*, 928 F.3d 218, 221–22 (2d Cir. 2019) (citing the *JLM Indus.* standard).

*Bernard Sch. of Montville, Inc. v. Bank of Am.*, 312 Conn. 811, 832 (2014) (citing *Ubysz v. DiPietro*, 185 Conn. 47, 51 (1981) (internal quotation marks omitted)).

Although whether the Defendants and Scott contracted in the Caregiver Agreement was, at the beginning of this litigation, a fraught and complicated issue, it is not now:  There was no meeting of the minds between the Defendants and Scott in the Caregiver Agreement.  Recall that the Caregiver Agreement contained a blank space where it should have identified the franchise entity—"GRISWOLD"—with whom Scott was contracting.  *See* Caregiver Agreement, Doc. No. 15-2, at 2.  It was not reasonably certain—in fact, far from it—that "GRISWOLD" was either FMCH or Cathy Howard.

The evolution of the Defendants' submissions alone indicates that there was no meeting of the minds between Scott and the Defendants in the Caregiver Agreement.  At first, the Defendants were certain that FMCH was "GRISWOLD."  They even argued that Scott's work for FMCH in 2017 and 2018 made that conclusion more certain.  Now, the Defendants are certain that CKJH was "GRISWOLD."  Moreover, the Defendants now represent that Scott *never* had any relationship with FMCH whatsoever.  *See* C. Howard's 2d Decl., Doc. No. 49, at ¶ 6 ("FMCH, Inc. was not the entity that contracted with Ionie Scott.  Ms. Scott did not ever provide services through FMCH, Inc.  In fact, FMCH, Inc. is not a referral service, had no relationship with Ms. Scott, and did not employ her, use her services, or pay her.").  Given all that, Scott's position—that she was not reasonably certain about with whom she was contracting on May 23, 2016—clearly has support in the record.  In sum, the Defendants have failed to demonstrate that they entered into an enforceable agreement to arbitrate with Scott.

2. *The Defendants Cannot Enforce the Arbitration Agreement Against Scott.*

Even though the Defendants now concede that CKJH was "GRISWOLD" in the Caregiver Agreement, they still argue that they can enforce the Arbitration Agreement against Scott (1) as a matter of equitable estoppel and (2) by the Arbitration Agreement's plain language. Both arguments fail. Relatedly, even though the Defendants do not raise it directly, I explain why (3) the Defendants may not compel Scott to arbitrate as a third-party beneficiary of the Caregiver Agreement.

    a.  Equitable Estoppel

A non-signatory to an arbitration agreement who attempts to compel a signatory to that agreement to arbitrate under a theory of equitable estoppel must demonstrate that

> (1) the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed, and (2) the relationship among the parties . . . justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.

*Medidata Sols., Inc. v. Veeva Sys., Inc.*, 748 F. App'x 363, 366 (2018) (citing *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010) (internal quotation marks omitted)).

With respect to the "intertwined" inquiry, "[t]he degree of interrelatedness necessary to allow a non-signatory to compel arbitration is extremely fact dependent." *Burger v. NIA Grp., LLC*, 2009 WL 10689079, at *5 (D. Conn. Sept. 8, 2009) (citing *Carroll v. Leboeuf, Lamb, Greene & MacRae, L.L.P.*, 374 F. Supp. 2d 375, 379 (S.D.N.Y. 2005) (internal quotation marks omitted)). More specifically, "the court must determine . . . whether the signatory's claims arise under the 'subject matter' of the underlying agreement." *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 402 (S.D.N.Y. 2003)); *see also Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, 591–92 (S.D.N.Y. 2005) (declining to find

"intertwined-ness" when the signatory's claims against non-signatory did not "aris[e] out of," were not "integrally related to," and did not "make reference to or presume the existence of" the underlying contract.  Some courts have even gone so far as to say that "[t]he plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is . . . always the *sine qua non* of an appropriate situation for applying equitable estoppel."  *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 976 (11th Cir. 2002), *rev'd on other grounds*, *PacifiCare Health Sys. v. Book*, 538 U.S. 401 (2003); *see also Wojcik v. Midland Credit Mgmt., Inc.*, 2019 WL 3423567, at *6 (E.D.N.Y. July 30, 2019) (citing *In re Humana*, 285 F.3d at 976; *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 709 (10th Cir. 2011)); *Massen v. Cliff*, 2003 WL 2012404, at *4 (S.D.N.Y. May 1, 2003) (declining to allow nonsignatory to compel signatory to arbitration when, even if the underlying contract "were found to be invalid or unenforceable, it would not affect plaintiff's right to recover").

With respect to the "close relationship" inquiry, Judge Leval undertook an analysis of the Second Circuit's relevant precedents and offered the following analysis regarding the circumstances that must be present to allow a nonsignatory to compel a signatory to an arbitration agreement to arbitrate:

> In each case, the promise to arbitrate by $x$, the entity opposing arbitration, was reasonably seen on the basis of the relationships among the parties as extending not only to $y$, its contractual counterparty, but also to $y^1$, an entity that was, or would predictably become, with $x$'s knowledge and consent, affiliated or associated with $y$ in such a manner as to make it unfair to allow $x$ to avoid its commitment to arbitrate on the ground that $y^1$ was not the very entity with which $x$ had a contract. The estoppel did not flow merely from $x$'s agreement to arbitrate with *someone* ($y$) in disputes relating to the agreement.  It flowed rather from the conclusion that the relationships among the parties developed in a manner that made it unfair for $x$ to claim that its agreement to arbitrate ran only to $y$ and not to $y^1$.

*Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008).[14]  (In this case, Scott is $x$, CKJH is $y$, and the Defendants (really, FMCH) are $y^1$.)  A "close corporate and operational relationship" between $y$ and $y^1$ does not necessarily satisfy the "close relationship" inquiry.  *See id.* at 362.  Instead, something more is normally required.  For example, some courts that have compelled arbitration in similar circumstances noted that $x$ had treated $y^1$ in some way as a party to the underlying contract.  *See, e.g.*, *JLM Indus.*, 387 F.3d at 177–78; *Astra Oil Co., Inc. v. Rover Navigation, Ltd.*, 344 F.3d 276, 281 (2d Cir. 2003).  Other courts that have compelled arbitration in similar circumstances point out that the dispute between $x$ and $y^1$ is "essentially an aspect of the [] controversy" between $x$ and $y$.  *See Choctow Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 408 (2d Cir. 2001).

The Defendants argue that they may compel arbitration under the Caregiver Agreement because Scott's complaint alleges that "all the defendants" violated her rights under the FLSA and analogous Connecticut state law.  *See* Defs.' Supp. Mot. to Dismiss, Doc. No. 49, at 2–3. The Defendants then circularly conclude:  "Thus, based on the allegations in the Complaint, the issues between plaintiff and defendant FMC[H], and the issues between plaintiff and defendant Cathy Howard are clearly 'intertwined' with the Caregiver Agreement with C[KJ]H under which plaintiff performed home health aide services."  *Id.* at 3.  Scott responds that her allegations do not involve in any way the Caregiver Agreement, which governs a relationship in which Scott worked as an independent contractor for a referral service.  *See* Pl.'s Reply to Supp. Mot. to Dismiss, Doc. No. 54, at 5; Caregiver Agreement, Doc. No. 15-2, at 2 ("This Agreement contains the terms under which Your listing on [GRISWOLD's registry of Caregivers available

---

[14]  Judge Leval examined the following cases:  *JLM Indus. v. Stolt-Nielson SA*, 387 F.3d 163 (2d Cir. 2004); *Astra Oil Co., Inc. v. Rover Navigation, Ltd.*, 344 F.3d 276 (2d Cir. 2003); *Choctow Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403 (2d Cir. 2001); *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88 (2d Cir. 1999).

for referral] will take place.").  Scott explains that, in this case, she sues the Defendants because they "were her joint employers, determined her specific work assignments and hours of operation, assigned her to a fixed work schedule, required her approval in advance of any change to their schedule and required her to address to [them] any concerns, complaint or other issues concerning the provision of services."  Pl.'s Reply to Supp. Mot. to Dismiss, Doc. No. 54, at 5. In contrast, Scott's claims explicitly do *not* "ar[i]se pursuant to the type of referral arrangement contemplated in the" Caregiver Agreement.  *Id.* at 6.

Scott has the better of the argument.  Regarding the "intertwined-ness" inquiry, the Defendants have not shown that Scott's claims in this case have anything at all to do with the Caregiver Agreement.  Because Scott does not rely on the Caregiver Agreement as the basis for her claims against the Defendants, there is no equitable reason why the Defendants may compel Scott to arbitrate under the Caregiver Agreement and estop Scott from bringing suit.[15]  Scott's claims against the Defendants are direct employment claims based on the FLSA and analogous Connecticut state law.  Scott alleges that the Defendants employed and paid her directly.  *See* Compl., Doc. No. 1, at ¶¶ 44–48; Wage Report, Ex. 2 to Pl.'s Opp'n, Doc. No. 21-1, at 6–8.  The Defendants concede that FMCH was *not* a referral service.  *See* C. Howard's 2d Decl., Doc. No. 49, at ¶ 6.  They also—in their most recent submission[16]—contest whether they ever had any relationship with Scott whatsoever.  *See id.*  The Defendants may or may not be correct about their relationship with Scott.  But their argument—and the affidavit supporting it—completely undermines their position that the Caregiver Agreement is intertwined with this lawsuit.  If

---

[15]  By their own admission, the Defendants also have never relied on the Caregiver Agreement.  *See* C. Howard's 2d Decl., Doc. No. 49, at ¶ 6.  Thus, under Connecticut law, the Defendants cannot claim estoppel.  *See, e.g.*, *Soares v. Max Servs., Inc.*, 42 Conn. App. 147, 170 (1996) ("Estoppel requires [1] proof of misleading conduct by one party [2] resulting in detrimental reliance by the one claiming estoppel.").

[16]  Of course, that is only their most recent position.  As discussed above, in their opening briefing, the Defendants argued that Scott worked for them as an independent contractor.

FMCH never had any relationship with Scott, then maybe Scott's lawsuit against FMCH will

fail.  But that lack of relationship counsels *against* allowing FMCH to compel Scott to

arbitration.

Relatedly, the record does not support the assertion that Scott knew or expected that her

obligations under the Caregiver Agreement would extend to FMCH.  Admittedly, FMCH and

CKJH overlap in their fictitious names, management structures, and employee pools:  Cathy

Howard is a principal of both,[17] and Jessica Howard is a principal of CKJH and an employee of

FMCH.  However, as already discussed, the Caregiver Agreement governs a relationship

between Scott and a *referral* service for whom Scott would be acting as an independent

contractor.  Scott claims in this case that FMCH employed and paid her *directly*.  The

Defendants themselves repeatedly emphasize that vital difference between FMCH and CKJH.

*See, e.g.*, C. Howard's 2d Decl., Doc. No. 49, at ¶ 2 ("During some of the times relevant to this

case, Ionie Scott received referrals for homecare services from CKJH, Inc."); *id.* at ¶ 6 ("Ms.

Scott did not ever provide services through FMCH, Inc.  In fact, FMCH, Inc. is not a referral

service, had no relationship with Ms. Scott, and did not employ her, use her services, or pay

her.").  It is far from clear that Scott understood that her obligations under the Caregiver

Agreement would extend to a direct employment relationship with a different entity.

In sum, there is no equitable reason that I should estop Scott from attempting to avoid

arbitration with the Defendants.  Scott does not rely on the Caregiver Agreement as the basis for

her claims in this case.  According to Scott, she worked for the Defendants, who underpaid her in

violation of federal and state employment law.  Indeed, Scott submits evidence that the

Defendants' third-party processor paid her directly.  According to the Defendants, Scott had

---

[17]  Cathy Howard's status as a defendant, though, is plainly based on her role as principal of FMCH.

absolutely no relationship with them.  Discovery will (hopefully) explain the relationship

between Scott and the Defendants.  But the Defendants cannot claim that, on one hand, they had

no relationship with Scott whatsoever, and, on the other hand, that their relationship with Scott

was foreseeable enough in the Caregiver Agreement that Scott should be forced to arbitrate with

them under that Agreement.  Put simply, the Defendants take contradictory positions that

undercut their argument that Scott should be bound by the Caregiver Agreement even if she did

not enter into that agreement with them.

b.  Plain Language

The Defendants also argue that, even though they are nonsignatories to the Caregiver

Agreement, they can compel Scott to arbitration under the plain language of that Agreement.

The Defendants point to the first paragraph of the Arbitration Agreement, which reads:

> Any and all disputes, claims or controversies arising out of or relating to this
> Agreement, Your Services under this Agreement and any and all other disputes,
> claims or controversies by and between You, on the one hand, and GRISWOLD,
> its franchisor, and their respective Clients, customers, and vendors (collectively,
> the "GRISWOLD PARTIES"), on the other hand, shall be resolved exclusively
> through final and binding arbitration (and not by way of a court or jury trial) as
> follows . . . .

*See* Caregiver Agreement, Doc. No. 15-2, at 3 (¶ 8).  The Defendants explain:  "Because both

FMCH and CKJH were doing business as Griswold Home Care, both FMCH and CKJH are

entitled by the terms of the Caregiver Agreement to enforce it."  Defs.' Supp. Mot. to Dismiss,

Doc. No. 49, at 3–4.

Scott responds that the Defendants are incorrect because "GRISWOLD" is a defined term

within the Caregiver Agreement.  Recall that the Caregiver Agreement begins:

> The parties to this Agreement ("Agreement") are the independently owned and
> operated franchise entity _____ licensed to do
> business as GRISWOLD HOME CARE, A Referral Service, ("GRISWOLD"), and

23

the individual Caregiver whose signature appears below ("You") or collectively,
the "Parties".

*See* Caregiver Agreement, Doc. No. 15-2, at 2.  Thus, "GRISWOLD" in the Caregiver

Agreement refers to a *single* franchise entity.  As the Defendants now concede, CKJH was

intended to fill in the blank space following "franchise entity," and so CKJH was "GRISWOLD"

in the Caregiver Agreement.  *See* Defs.' Supp. Mot. to Dismiss, Doc. No. 49, at 3–4.  Scott

argues, then, that "GRISWOLD" cannot also be FMCH.  Scott concludes:  "Using Defendants'

logic, any entity doing business as Griswold Home Care would be included within the arbitration

agreement."  Pl.'s Reply to Supp. Mot. to Dismiss, Doc. No. 54, at 8.

Again, Scott has the better of the argument.  In the Caregiver Agreement, "GRISWOLD"

is a defined term that refers to a single franchise entity, and the Defendants now concede that it

refers to CKJH.  Thus, it would be simply illogical to conclude that "GRISWOLD" also refers to

FMCH.  Adopting the Defendants' position—that FMCH is "GRISWOLD" because it does

business as "Griswold Home Care"—would also lead to an absurd result:  all franchisees doing

business as "Griswold Home Care" would have a right to compel Scott to arbitration.  There are

over 150 franchisees of Griswold Home Care across the country doing business under the

fictitious name "Griswold Home Care," including about 17 in Pennsylvania alone.[18]  In addition,

the Defendants are not included in the "GRISWOLD PARTIES" referred to in the Arbitration

Agreement because they are neither CKJH's franchisor nor clients, customers, or vendors of

CKJH or its franchisor.  The Defendants find no help in the plain language of the Caregiver

Agreement and the Arbitration Agreement.

---

[18]  *See* Bus. Entities, Ex. A to Decl. of G. Hawkins in Support of Berks's Mot. to Dismiss, Doc. No. 38-2, at 4–10.

c. Third-Party Beneficiary

Although the parties do not argue the issue, I note that the Defendants also cannot compel arbitration in this case as a third-party beneficiary under the Caregiver Agreement. Under Connecticut law, a "third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract." *Wykeham Rise, LLC v. Federer*, 305 Conn. 448, 473 (2012) (quoting *Wilcox v. Webster Ins., Inc.*, 294 Conn. 206, 217 (2009)). In determining whether a person has a right of action as a third-party beneficiary, "the ultimate test . . . is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party." *Id.* at 474; *see also Filloramo v. NewAlliance Invs., Inc.*, 2007 WL 1206736, at *3 (D. Conn. Apr. 23, 2007) (quoting *Knapp v. New Haven Rd. Constr. Co.*, 150 Conn. 321, 325 (1963)). "[T]hat intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties." *Wykeham Rise*, 305 Conn. at 474–75 (citing *Dow & Condon, Inc. v. Brookfield Dev. Corp.*, 266 Conn. 572, 580 (2003) (internal quotation marks omitted)); *see also Filloramo*, 2007 WL 1206736, at *3 (citing *Barnard v. Barnard*, 214 Conn. 99, 110 (1990)). "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." *Filloramo*, 2007 WL 1206736, at *3 (citing *Montoya v. Montoya*, 280 Conn. 605, 612 (2006)).

The Caregiver Agreement's plain language indicates that the parties did not intend for Scott to assume any direct obligation to the Defendants. That is because FMCH is nowhere explicitly or by implication referenced in the Agreement. As noted above, the parties to the Caregiver Agreement were Scott and "GRISWOLD," which was intended to be CKJH. The parties to the Arbitration Agreement, again, were Scott, and the "GRISWOLD PARTIES," who were CKJH, "its franchisor, and their respective Clients, customers, and vendors." Caregiver

Agreement, Doc. No. 15-2, at 3 (¶ 8).  Because the Defendants are none of those entities, they are not a party to the Caregiver Agreement or Arbitration Agreement.  Further, the Caregiver Agreement regarded the terms of Scott's being listed on CKJH's "registry of Caregivers available for referral."  *See id.* at 2.  But FMCH "is not a referral service."  C. Howard's 2d Decl., Doc. No. 49, at ¶ 6.  Nor is there reason to believe—and the Defendants do not advance the argument—that Scott knew in May 2016 (or at any time) about the overlap in personnel between FMCH and CKJH.  For all those reasons, the Defendants cannot compel Scott to arbitration pursuant to the Caregiver Agreement on the grounds that they are third-party beneficiaries of that Agreement.

C.   Scott's Claims are Plausible

Even though they apparently seek to dismiss Scott's claims for failure to state a claim, the Defendants do not mount such an argument and, instead, focus exclusively on whether they can compel Scott to arbitration.  In any case, I note that Scott's claims are plausible.  Pursuant to the FLSA, covered employees are entitled to pay of at least 150 percent of their normal hourly wage for all hours worked in excess of 40 hours per workweek.  *See* 29 U.S.C. § 207(a)(1).  The same is true under Connecticut state law.  *See* Conn. Gen. Stat. § 31-76c.  And, under Connecticut law, an employer may withhold wages only under limited circumstances.  *See* Conn. Gen. Stat. § 31-71e.

Scott claims that the Defendants employed her between February 2017 and December 2018.  *See* Compl., Doc. No. 1, at ¶ 4.  During that time, Scott claims that she "consistently worked well over" 40 hours per workweek but, still, was paid no overtime wages.  *See id.* at ¶¶ 64, 67–68.  In addition, Scott alleges that the Defendants withheld $10 per day in wages based on the promise that the Defendants (or their clients) would provide a daily meal of that value.  *Id.* at

¶ 72.  But—even though repeatedly brought to their attention—the Defendants (or their clients) never provided such meals and continued to deduct $10 per day in wages.  *Id.* at ¶¶ 73–75.

The Defendants make no argument about why Scott's allegations do not state a claim on the merits.  Instead, the Defendants simply contest the fact that they ever had any kind of employment (or other) relationship with Scott.  *See* C. Howard's 2d Decl., Doc. No. 49, at ¶ 6.  However, at the motion to dismiss stage, I must take Scott's allegations as true.  Thus, the Defendants mount no argument on their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and I see no independent reason why Scott's claims are not plausible.  Scott has stated a claim upon which relief can be granted.

## IV.    Conclusion

For the foregoing reasons, the Defendants' motion to dismiss, or, in the alternative, to stay and compel arbitration, doc. no. 15, is **denied**.

So ordered.

Dated at Bridgeport, Connecticut, this 26th day of May 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

27